PAT LOONTJER, APPELLEE AND CROSS-APPELLANT, V.
GREG ROBINSON ET AL., APPELLANTS AND CROSS-APPELLEES,
THE HONORABLE JOHN GALE, SECRETARY OF STATE OF
THE STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLEE,
AND TIMOTHY A. BUNDY, INTERVENOR-APPELLEE
AND CROSS-APPELLEE.
670 N.W.2d 301

Filed October 24, 2003.   No. S-02-1030.

John M. Boehm and Patrick T. O'Brien, of Butler, Galter,
O'Brien & Boehm, for appellants.

L. Steven Grasz and Michael S. Degan, of Blackwell, Sanders, Peper & Martin, L.L.P., for appellee Pat Loontjer.

J.L. Spray and Stephen D. Mossman, of Mattson, Ricketts, Davies, Stewart & Calkins, for intervenor-appellee.

Jon Bruning, Attorney General, and Dale A. Comer for appellee John Gale, Nebraska Secretary of State.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

Greg Robinson, Charles Whitney, Harry Prososki, Gerald Brown, Russell Dodd, Verlouis Forster, and Richard Lindauer, all members of the Committee for Local Option Gaming (the Committee), appeal from the district court's order enjoining the placement of an initiative petition on the ballot. The petition sought to accomplish the following:

(1) Revise the Nebraska Constitution to allow electronic gaming devices under local control;

(2) Provide limitations on the manner income from the gaming could be spent;

(3) Limit the ability of the Legislature to tax the gaming; and

(4) Require the creation of a gaming commission.

Appellee Pat Loontjer filed for declaratory relief and sought to enjoin the placement of the petition on the ballot.

The district court determined there was substantial compliance with Neb. Rev. Stat. § 32-1405(1) (Reissue 1998), which requires the sponsors of an initiative petition to file a sworn statement listing their names and street addresses. The court also determined, however, that the petition violated the single subject rule of Neb. Const. art. III, § 2. Thus, the court enjoined the placement of the initiative on the ballot. Loontjer cross-appeals the court's determination that there was substantial compliance with § 32-1405(1).

We determine that the petition was legally insufficient because the sponsors failed to include a sworn statement of their names and street addresses. Accordingly, we affirm.

## BACKGROUND

On December 16, 2001, the appellants submitted an Initiative for Local Option Gaming to the Nebraska Secretary of State for review before circulating the petition for signatures to place the initiative on the ballot. The initiative petition was not individually signed. Instead, "THE LOCAL OPTION GAMING COMMITTEE BOX 636 KIMBALL, NEBRASKA 69145" was typed at the end. The appellants submitted a cover letter, omitting their addresses; however, it was not sworn. A handwritten note signed by Prososki stated that Bill Kurtenbach "can take care of any correspondence for me" and provided Kurtenbach's post office box address. Testimony at trial showed that the appellants are members of the Nebraska Cooperative Government Commission (NCGC), an interlocal agency that operates keno for a group of about 72 cities, counties, and villages in Nebraska. Kurtenbach is an attorney that represents the NCGC.

In January 2002, the appellants submitted the final draft; the draft does not contain a sworn statement of the sponsors with their street addresses. Instead, it contains an unsworn typed signature of the Committee and provides street and Internet addresses. A cover letter contains the unsworn signatures of the appellants and their telephone numbers. The appellants offered an exhibit, Kurtenbach's sworn statement, filed with the Secretary of State 3 days before trial, stating that the appellants constitute all of the sponsors of the petition. The court, however, ruled that the exhibit was inadmissible.

The record shows that the NCGC contracted with Community Lottery Systems, Inc., also known as Lotto Nebraska, a company operated by Paul Schumacher, to run keno. Schumacher also owns an interest in Community Internet Systems, Inc., which hosts an Internet Web site for the Committee.

The record shows that the initial work on the petition was done through the NCGC, and the Committee was formed later. A "Statement of Organization of a Political Committee" was not filed for the Committee until December 26, 2001. Robinson, the chairman of both the Committee and the NCGC, testified that the earliest versions of the petition were drafted at his request by Schumacher, Kurtenbach, and a law firm. Robinson stated that he believed Schumacher was involved in drafting the petition

from "day one." He believed that drafting the petition was part of Kurtenbach's duties as general counsel for the NCGC.

In July 2001, after early versions had already been drafted, a motion was passed at a NCGC meeting to ask Schumacher and Kurtenbach to draft a petition. Specifically, minutes of the July 28, 2001, NCGC meeting state:

> **Item No. 7:** Discussion and action on gaming legislation in the 2001 legislative session and initiative petitions
>
> Motion- Whitney, second- Forster, to encourage Lotto Nebraska and the NCG General Counsel to (1) cause an initiative petition drive to be commenced that would permit cities and counties to conduct games of chance or skill or any combination thereof using player activated electronic gaming devices for the purpose of local tax relief and keeping Nebraska resources in Nebraska, and (2) form the necessary alliances to accomplish the circulation and passage of such a petition in the November, 2002, general election . . . .

The motion passed unanimously. On October 26, 2001, the NCGC voted to endorse the enactment of the petition. The record also contains evidence that Schumacher asked the Committee to "sponsor" the petition. When Robinson delivered signed petitions to the Secretary of State's office in July 2002, he delivered a speech that Schumacher helped to draft. Schumacher arranged and paid for Robinson to arrive at the State Capitol Building by charter airplane.

Kurtenbach testified that several people, including Schumacher, had the initial idea to seek a constitutional amendment to allow video gambling. Kurtenbach agreed that a section of the initiative requires that no gaming operator shall be licensed unless it has demonstrated proficiency in operating local government lotteries. Kurtenbach believed around a dozen companies would meet the requirement. According to Kurtenbach, various people, including himself, Schumacher, and Whitney drafted language in the petition.

Schumacher has been described as the person who spearheaded the fundraising for the Committee after it was formed. Schumacher or his corporation contributed $62,000 to the Committee. According to Robinson, Schumacher was not made

an "official sponsor" of the petition because his company had the potential to profit if the initiative was passed. Schumacher testified that it was not his initial idea to try to get a constitutional amendment allowing video gaming. Instead, he testified about several people or groups that had an interest in seeking an amendment. He admitted to being involved in the drafting process, but denied drafting the early forms of the petition or the entire petition. According to Schumacher, it was Kurtenbach's idea to form the Committee. Schumacher was involved in the process to obtain signatures on the petition, but the level of that involvement is unclear.

The deputy Secretary of State testified that he believed the sponsors of the petition were the appellants. He stated that his office provides a place at the bottom of a petition for sponsors to place any information regarding where to return signed petitions, which information in this case was the name and address of the Committee.

The Secretary of State determined that the petition received enough signatures to place it on the ballot. Loontjer sought declaratory and injunctive relief to stop the petition from being placed on the ballot. Loontjer alleged that the petition (1) failed to include a sworn statement of its sponsors in violation of § 32-1405; (2) violated the single subject rule under Neb. Const. art. III, § 2; (3) contained an insufficient ballot title; and (4) violated the taxing authority of the Legislature. Appellee Timothy A. Bundy intervened with the same allegations but did not challenge the existence of a sworn statement. The Secretary of State was named as a defendant to the action.

In addressing whether the petition properly contained a sworn statement of the sponsors, the district court determined that Schumacher and Kurtenbach were not "sponsors" of the petition. The court also determined that the Committee was not a sponsor of the petition and dismissed it from the action. Instead, the court determined that the individual appellants were the sponsors.

The court next determined that although the appellants failed to include a sworn statement with their street addresses, they had substantially complied with the requirements of § 32-1405(1). The court determined that the purpose of § 32-1405(1) is to avoid fraud and deception and concluded that the appellants had

provided enough information to make it possible to identify and locate them as the sponsors of the petition.

The court ruled, however, that the petition violated the single subject rule. The court determined that the petition's purpose is the "expansion of gambling." The court then addressed the single subject issue and determined that the following provisions of the petition lacked a natural or necessary connection with each other or the purpose of the petition:

(1) the requirement that at least 7% of the net proceeds be used for charitable grants;

(2) the authorization that revenue obtained from the permitted gambling to be used for bonuses to certified teachers and programs of tuition credits to students;

(3) the prohibition against the Legislature from levying any special or excise tax on the permitted gambling;

(4) the authorization for the creation of what appear to be new political subdivisions, by means of interlocal agreements; and

(5) the restriction against the Legislature from authorizing any form of gambling that would compete with the permitted gambling.

The court enjoined the Secretary of State from placing the petition on the ballot. The appellants filed this appeal, and Loontjer cross-appealed.

## ASSIGNMENTS OF ERROR

The appellants assign, consolidated and rephrased, that the district court erred in (1) failing to dismiss the case because the pleadings did not present a justiciable controversy that was ripe for determination and (2) determining that the petition violated the single subject rule and granting injunctive relief.

On cross-appeal, Loontjer assigns, consolidated and rephrased, that the court erred by failing to declare the petition legally insufficient for failure to include a sworn statement containing the names and addresses of the sponsors.

## STANDARD OF REVIEW

A jurisdictional question which does not involve a factual dispute is a matter of law. *State ex rel. Steinke v. Lautenbaugh*, 263 Neb. 652, 642 N.W.2d 132 (2002).

An action for injunction sounds in equity. In an appeal of an equitable action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, when credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Reichert v. Rubloff Hammond, L.L.C.*, 264 Neb. 16, 645 N.W.2d 519 (2002).

## ANALYSIS

### JURISDICTION

The appellants first contend that the district court should have dismissed the action because it did not present a justiciable controversy that was ripe for determination.

Neb. Rev. Stat. § 32-1412(2) (Reissue 1998) provides:

> On a showing that an initiative or referendum petition is not legally sufficient, the court, on the application of any resident, may enjoin the Secretary of State and all other officers from certifying or printing on the official ballot for the next general election the ballot title and number of such measure. If a suit is filed against the Secretary of State seeking to enjoin him or her from placing the measure on the official ballot, the person who is the sponsor of record of the petition shall be a necessary party defendant in such suit.

We have stated that a district court properly refused to address a prayer for declaratory relief when it sought a declaration that a term limits initiative violated the U.S. Constitution. *Duggan v. Beermann*, 249 Neb. 411, 544 N.W.2d 68 (1996). Under those circumstances, we stated, "The court correctly declined to enter an advisory opinion or any declaratory judgment unless and until the initiative measure was adopted." *Id.* at 424, 544 N.W.2d at 76.

Here, § 32-1412 allows a court to consider whether an initiative petition is "legally sufficient." Questions dealing with statutory provisions concerning the form of a petition and the technical requirements of the sponsors affect the legal sufficiency

of an initiative. The issue whether the petition is legally sufficient, as presented by Loontjer's cross-appeal, is ripe for review.

SWORN STATEMENT

On cross-appeal, Loontjer contends that the initiative petition is legally insufficient because it does not contain a sworn statement of the sponsors listing their names and street addresses. The appellants admit that the initiative does not contain a sworn statement but argue that they substantially complied with the requirement when the cover letter with the initiative contained the names of the sponsors and post office box addresses.

Section 32-1405(1) provides:

Prior to obtaining any signatures on an initiative or referendum petition, a statement of the object of the petition and the text of the measure shall be filed with the Secretary of State together with a sworn statement containing the names and street addresses of every person, corporation, or association sponsoring the petition.

The Nebraska Constitution reserves the right of the people to enact constitutional amendments by initiative. Neb. Const. art. III, § 2. It also authorizes legislation to facilitate the operation of the initiative process. Neb. Const. art. III, § 4. " ' "[T]he constitutional provision authorizing the legislature to enact laws to facilitate the operation of the initiative power means that it may enact reasonable legislation to prevent fraud or to render intelligible the purpose of the proposed law or constitutional amendment. . . ." ' " *State ex rel. Stenberg v. Moore*, 258 Neb. 199, 211, 602 N.W.2d 465, 474 (1999).

The Legislature and the electorate are concurrently equal in rank as sources of legislation, and provisions authorizing the initiative should be construed in such a manner that the legislative power reserved in the people is effectual. *Id.* Thus, we stated that " 'the power of initiative must be liberally construed to promote the democratic process and that the right of initiative constitutionally provided should not be circumscribed by restrictive legislation or narrow and strict interpretation of the statutes pertaining to i[t]s exercise.' " *Id.* at 212-13, 602 N.W.2d at 476. Because we avoid limiting the right of initiative

through strict or narrow interpretation, we have, in some circumstances, allowed substantial compliance with the statutes pertaining to the initiative. See, e.g., *id.*; *State ex rel. Morris v. Marsh*, 183 Neb. 521, 162 N.W.2d 262 (1968).

This court specifically addressed the requirement for a sworn statement by sponsors in *State, ex rel. Winter, v. Swanson*, 138 Neb. 597, 294 N.W. 200 (1940). In *State, ex rel. Winter*, the Secretary of State refused to accept initiative petitions that were not in conformance with the provisions of a statute that preceded § 32-1405(1). That statute required a sworn statement containing the names of the sponsors and people or associations that contributed or pledged money to defray the cost of the petition. See 1939 Neb. Laws, ch. 34, § 13, p. 184-85. We stated that the provision requiring the filing of the names of sponsors was a safeguard against fraud and deception. We then rejected an argument that the provisions of the statute were directory instead of mandatory, stating:

> It seems to us that none of the features of a directory statute is present in this case. It would seem to us that an anomalous situation would be created if statutory safeguards against the perpetration of frauds and deceptions were held to be directory. Such requirements must by their very nature be mandatory, or the purposes of the legislature will be completely defeated. We hold that the provisions of the statute herein discussed are mandatory and that the failure of relators to comply therewith justifies the action of the secretary of state in refusing to file the same.

*State, ex rel. Winter, v. Swanson*, 138 Neb. at 599, 294 N.W. at 201.

We later distinguished the mandatory sworn statement requirement from a situation involving the *late filing* of a verified statement of contributions and expenses. In the case of a late filing which was ultimately complete and met all the other requirements of the statute, we allowed substantial compliance. *State ex rel. Morris v. Marsh, supra.* In *State ex rel. Morris*, we specifically noted the complete failure of the relators in *State, ex rel. Winter*, to file a copy of the petition and the sworn statement.

■ Here, the appellants ask us to determine that they substantially complied with the sworn statement requirement of

§ 32-1405(1), but we decline to do so. Instead, we determine that the sworn statement provision is mandatory. As we stated in *State, ex rel. Winter,* the language of the statute is not directory.

Requiring a sworn statement is not an onerous duty. Further, the sworn statement requirement serves several important purposes. First, by providing a sworn statement, the sponsors take responsibility for the petition and expose themselves to potential criminal charges if information is falsified. See Neb. Rev. Stat. § 32-1502 (Reissue 1998) (making election falsification under oath Class IV felony). This requirement prevents fraud in the process. Second, the provision allows the public and the media to scrutinize the validity and the completeness of any list of sponsors. Knowing the petition's sponsor could affect the public's view about an initiative petition. For example, a petition sponsored by a large casino might have less appeal to some members of the public than a petition sponsored by local citizens. A sworn list of the sponsors and their street addresses allows the public to make an informed judgment whether to sign the petition. Third, under § 32-1412, the sponsor of an initiative shall be a necessary party to any suit seeking to enjoin the placement of an initiative on the ballot. The failure to provide a sworn statement of the sponsors and street addresses can frustrate the ability to join necessary parties in a lawsuit.

Here, the statement of the sponsors omitted some street addresses and it was never sworn. Because the appellants failed to file a sworn statement, the petition is legally insufficient.

Although the appellants offered an exhibit containing a sworn statement 3 days before trial, the statement was not provided to the Secretary of State before the petition was circulated for signatures. The district court did not allow the exhibit into evidence, and the appellants do not assign the court's refusal to do so as error. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *Forgét v. State,* 265 Neb. 488, 658 N.W.2d 271 (2003). Thus, we do not consider the exhibit.

The initiative petition was legally insufficient because it omitted a sworn statement of the sponsors and their street addresses. Accordingly, the district court should have enjoined placing the initiative on the ballot because it lacked a sworn

statement. Instead, the district court enjoined placing the petition on the ballot because it violated the single subject rule. Because we affirm based on Loontjer's cross-appeal, we do not address the single subject rule, nor do we address whether Schumacher and Kurtenbach were sponsors of the petition.

AFFIRMED.

HENDRY, C.J., concurring in the result.

I concur with the result reached by the majority. However, I write separately as I respectfully disagree with the majority's conclusion that it need not decide whether the appellants substantially complied with Neb. Rev. Stat. § 32-1405(1) (Reissue 1998). In my view, the district court appropriately considered substantial compliance and correctly determined that substantial compliance with § 32-1405(1) was shown.

Relying on *State, ex rel. Winter, v. Swanson*, 138 Neb. 597, 294 N.W. 200 (1940), the majority holds that the sworn statement provision of § 32-1405(1) is mandatory rather than directory. However, given the factual distinctions and our recognition that "the right of initiative . . . should not be circumscribed by . . . narrow and strict interpretation of the statutes pertaining to i[t]s exercise," *State ex rel. Morris v. Marsh*, 183 Neb. 521, 531, 162 N.W.2d 262, 269 (1968), I do not believe that *State, ex rel. Winter,* precludes substantial compliance.

In *Marsh, supra,* a case in which we applied substantial compliance, we determined that the petitioners had substantially complied with the statutory requirements of the predecessor to § 32-1405(1) and affirmed the district court's decision to require the State to place the petition on the ballot. Although substantial compliance was not invoked in *Marsh* to specifically address the absence of a verified statement, we nonetheless distinguished *State, ex rel. Winter,* by noting that *State, ex rel. Winter,* "involved a complete failure to file both the copy of the form of petition to be used and the preliminary sworn statement." *Marsh,* 183 Neb. at 534, 162 N.W.2d at 270. In noting such distinction in *Marsh,* I believe *State, ex rel. Winter,* should be read as simply recognizing the impossibility of applying substantial compliance in a situation where the record clearly demonstrated a "complete failure" to comply.

It is axiomatic that without some level of compliance, there can never be substantial compliance. The case before us is not one in which there was a "complete failure" to comply with § 32-1405(1). Rather, the record shows that the final draft of the proposed initiative petition, together with a cover letter signed by the appellants, which included either a street address or post office box for each appellant, was filed with the Secretary of State. Moreover, preliminary drafts and cover letters had previously been submitted to the Secretary of State, which ultimately culminated in the initiative petition at issue. Given the importance of the initiative process in our governmental structure and recognizing that "the right of initiative . . . should not be circumscribed by restrictive legislation or narrow and strict interpretation of the statutes pertaining to i[t]s exercise," *Marsh*, 183 Neb. at 531, 162 N.W.2d at 269, I would reach the issue of substantial compliance. In reaching that issue, I agree with the district court that substantial compliance with § 32-1405(1) has been shown.

Section 32-1405(1) is part of the legislative procedure through which citizens of Nebraska exercise their power of initiative. This court has emphasized the importance of this process, stating: "The decisions almost universally hold that the power of initiative must be liberally construed to promote the democratic process and that the right of initiative constitutionally provided should not be circumscribed by restrictive legislation or narrow and strict interpretation of the statutes pertaining to its exercise." *State ex rel. Morris v. Marsh*, 183 Neb. 521, 531, 162 N.W.2d 262, 269 (1968). We have further stated that " '[t]he right of initiative is precious to the people and is one which the courts are zealous to preserve to the fullest tenable measure of spirit as well as letter.' " *State ex rel. Brant v. Beermann*, 217 Neb. 632, 636, 350 N.W.2d 18, 21 (1984) (quoting *McFadden v. Jordan*, 32 Cal. 2d 330, 196 P.2d 787 (1948)).

Substantial compliance, in the context of a statute, has been defined as

"actual compliance in respect to the substance essential to every reasonable objective of the statute. It means that a court should determine whether the statute has been followed sufficiently so as to carry out the intent for which it

was adopted. Substantial compliance with a statute is not shown unless it is made to appear that the purpose of the statute is shown to have been served. What constitutes substantial compliance with a statute is a matter depending on the facts of each particular case."

*Larson v. Hazeltine*, 552 N.W.2d 830, 835 (S.D. 1996). The key determination, therefore, is identifying the purpose of the statute and whether that purpose has been served.

In *State, ex rel. Winter, v. Swanson*, 138 Neb. 597, 599, 294 N.W. 200, 201 (1940), this court discussed the purpose of the statutory predecessor to § 32-1405(1) as follows:

The requirement that the form of the petition be filed with the secretary of state before the petitions were circulated is calculated to advise the electorate in advance as to the exact provisions of the proposal through publicity resulting from its filing. By this means the proposal is rendered intelligible and the possibilities of fraud greatly reduced. The requirement that the name of every person, corporation or association sponsoring the petition or contributing or pledging contributions to defray the cost of preparation, printing and circulation of petitions be filed is likewise a safeguard against fraud and deception.

Thus, according to *State, ex rel. Winter*, the purpose to be served by what is now § 32-1405(1) is to safeguard against fraud by informing the public of the exact provisions of the proposal, as well as identifying the sponsors of such proposal.

I believe that given the record before us, the filings with the Secretary of State met the purpose of § 32-1405(1); thus the appellants substantially complied with the statute.

Pat Loontjer contends that the appellants' filings fail to substantially comply with § 32-1405(1) for essentially three reasons. First, Loontjer argues that the purpose of a sworn statement is to prevent fraud and deception. Loontjer contends that under Nebraska's election laws, the making of a false statement under oath is a crime and the ability to hold a signer liable for criminal penalties acts to safeguard against possible fraud and deception. A fortiori, Loontjer reasons the purpose of § 32-1405(1) has not been met and, therefore, substantial compliance has not been shown.

However, I concur with the district court's determination that the primary purpose of § 32-1405(1) is not to "facilitate criminal prosecution." In addition, as the district court observed, although *State, ex rel. Winter,* "requir[ed] the name of every person sponsoring an initiative petition [a]s a 'safeguard against fraud and deception,'" *State, ex rel. Winter,* "did not state that the filing of a *sworn* statement provided such a safeguard." In the district court's order, it reasoned, and I agree, that

> [a]lthough having a statement made under oath or verified may facilitate criminal prosecution, it does not seem realistic to believe that a person who is intent on engaging in a deception is going to be deterred by whatever ramifications there may be of falsifying a statement under oath to the Secretary of State.

Furthermore, as stated earlier, the purpose of § 32-1405(1) is to safeguard against fraud and deception by requiring those who are sponsoring the initiative petition to identify themselves in a sworn statement filed with the Secretary of State. The district court found that the individuals who signed the cover letter that was filed with the Secretary of State were in fact the actual initiative sponsors. In my de novo review of the record, giving weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another, see *Reichert v. Rubloff Hammond, L.L.C.,* 264 Neb. 16, 645 N.W.2d 519 (2002), I reach the same conclusion. As such, the purpose of § 32-1405(1) has been served, notwithstanding the absence of a sworn statement.

Second, Loontjer contends that the requirement of "street addresses" for each sponsor safeguards against fraud and deception. Loontjer argues that post office boxes are not "street addresses" and that the failure to provide "street addresses" for all sponsors does not substantially comply with the statute. However, I fail to see how, in this instance, the failure to include all "street addresses" is a safeguard against fraud and deception. Loontjer simply argues that "the street addresses for the sponsors were needed for summons and subpoenas, and most were not available." Brief for appellee Loontjer at 30. However, as the district court observed, "[i]t is clear . . . that, with the information provided by the individual defendants and a little work, [Loontjer]

was able to secure the information necessary to perfect service on the individuals [sic] defendants."

Finally, Loontjer asserts that Paul Schumacher, the Nebraska Cooperative Government Commission (NCGC), and the Committee for Local Option Gaming (the Committee) are sponsors and that the failure to list them in the documents filed with the Secretary of State violates § 32-1405(1).

The term "sponsor," as used in § 32-1405(1), is not defined in the statutes setting forth the procedure by which the initiative process is to be exercised. "Sponsor" is defined as "one who assumes responsibility for some other person or thing." Webster's Third New International Dictionary, Unabridged 2204 (1993).

In adopting a definition of the term "sponsor" in this circumstance, we must keep in mind that "the right of initiative . . . should not be circumscribed by restrictive legislation or narrow and strict interpretation of the statutes pertaining to i[t]s exercise." *State, ex rel. Morris v. Marsh,* 183 Neb. 521, 531, 162 N.W.2d 262, 269 (1968). Within that framework, it seems reasonable to define sponsor as simply one who identifies himself or herself as willing to assume statutory responsibilities once the initiative process has commenced. See, e.g., § 32-1405(2) (requiring Secretary of State to provide sponsor(s) with suggested changes made to initial proposal by Revisor of Statutes); Neb. Rev. Stat. § 32-1409(3) (Reissue 1998) (requiring Secretary of State to notify "the person filing the initiative" whether, in opinion of Secretary of State, sufficient valid signatures have been collected to meet constitutional and statutory requirements); Neb. Rev. Stat. § 32-1412(2) (Reissue 1998) (notifying sponsor(s) that in any suit commenced to enjoin Secretary of State from placing measure on official ballot, sponsor(s) of record will be party defendant(s) in such suit). In my view, those individuals agreeing to accept such responsibilities were identified in the documents filed with the Secretary of State.

In her brief, Loontjer specifically contends that "Schumacher sought to hide his involvement [with the petition] by creating a sham committee to advance the Petition. Hence, the Committee . . . was formed." Brief for appellee Loontjer at 28. Loontjer further alleges that Schumacher, together with Bill Kurtenbach, legal counsel for the NCGC, "recruited the same seven people

who serve on the [NCGC] to serve on the Committee." *Id.* Thus, Loontjer's concern appears to be that Schumacher's backing, financial or otherwise, was such that he must be identified as a sponsor of the petition and further, that Kurtenbach's involvement similarly involved the NCGC. However, in this instance, I do not believe such support equates to sponsorship.

The predecessor to § 32-1405(1) required the filing of a statement containing "the name or names of every person, corporation or association sponsoring said petition *or contributing or pledging contribution of money or other things of value*" with the Secretary of State. (Emphasis supplied.) See 1939 Neb. Laws, ch. 34, § 13, p. 184. Thus, even the predecessor of § 32-1405(1) recognized a possible distinction between one who sponsors a petition initiative and one who financially contributes to that effort.

Section 32-1405(1), as currently codified, goes even further by eliminating any filing requirement with the Secretary of State for those financially contributing to such petition effort. Such involvement must now be disclosed by filing with the Nebraska Accountability and Disclosure Commission. See, e.g., Neb. Rev. Stat. §§ 49-1454 and 49-1455 (Reissue 1998 & Cum. Supp. 2002). The record shows that Schumacher's financial contributions, made through Community Lottery Systems, Inc., were disclosed by the Committee in its filings with the Nebraska Accountability and Disclosure Commission.

In summary, I agree with the Secretary of State who persuasively argues that "the main purpose of § 32-1405(1) is to prevent fraud by requiring that petition sponsors advise the electorate in advance as to the exact provisions of their initiative proposal and as to precisely who sponsored their initiative. Clearly, the materials filed with the Secretary of State . . . do that." Reply brief for appellee Secretary of State at 13-14.

Although concluding that the appellants have substantially complied with § 32-1405(1), I nevertheless concur in the result.

In Justice Wright's concurrence, he determines, inter alia, that the appropriate standard in evaluating whether an initiative petition seeking a constitutional amendment contains more than one subject is the "natural and necessary connection" test set out in *Munch v. Tusa*, 140 Neb. 457, 300 N.W.2d 385 (1941). I agree with Justice Wright's reasoning and believe such result is further

supported by the applicable rules for determining the intent and understanding of a constitutional amendment.

The appellants contend that the standard articulated in *Anderson v. Tiemann*, 182 Neb. 393, 155 N.W.2d 322 (1967), should apply to the amendment. I disagree. In my view, the application of such standard cannot be justified when construing Neb. Const. art. III, § 2, as a whole. See *State ex rel. Spire v. Beermann*, 235 Neb. 384, 455 N.W.2d 749 (1990) (stating that with respect to determining intent and understanding of constitutional amendment, it is to be construed as whole, and no part is to be rejected as meaningless or surplusage if such can be avoided). The sentence in article III, § 2, immediately preceding the amended language at issue reads: "The constitutional limitations as to the scope and subject matter of statutes enacted by the Legislature shall apply to those enacted by the initiative." This sentence clearly applies to *statutes* enacted by initiative and "incorporates" the "one subject" requirement for legislative bills and resolutions found in Neb. Const. art. III, § 14. With respect to applying the "one subject" requirement to legislative bills and resolutions, it is true that in such circumstance this court has applied the broader standard set forth in *Tiemann, supra*. The problem with the appellants' argument, however, is I do not believe that construing article III, § 2, as a whole leads one back to article III, § 14.

Given my belief that the sentence quoted above from article III, § 2, refers only to *statutes* proposed by initiative, the amendment to article III, § 2, at issue, "[i]nitiative measures shall contain only one subject," must be a reference to the only remaining initiative power, that being the initiative whereby constitutional amendments may be adopted by the people. To read it otherwise would, in my view, fail to consider article III, § 2, as a whole. As such, the appropriate standard would not be that as applied to statutes (article III, § 14), but that as applied to a proposed constitutional amendment. That standard is found in *Munch, supra.*

Although *Munch*, was a proceeding to enjoin the placement upon the ballot of amendments to the city of Omaha's home rule charter, we have observed that "[t]he power to form a charter may be likened to the power of a people to form a constitution. The charter of a home rule city is its constitution." *Mollner v.*

*City of Omaha,* 169 Neb. 44, 50, 98 N.W.2d 33, 37 (1959). In *Munch, supra,* we reviewed cases involving constitutional amendments embracing several subjects and enunciated the standard applicable when constitutional amendments are at issue. That such standard is narrower than that applied to statutes is a recognition of the "seriousness of the business in which we are engaged. A legislative act may be amended or repealed at any succeeding session of the legislature. A constitutional provision is intended to be a much more fixed and permanent thing." *State, ex rel. Hall, v. Cline,* 118 Neb. 150, 154-55, 224 N.W. 6, 8 (1929). See, also, *Omaha Nat. Bank v. Spire,* 223 Neb. 209, 389 N.W.2d 269 (1986) (noting that differences between law and constitutional amendment enacted by initiative are obvious and great in that any law may later be repealed by Legislature but constitutional amendment (assuming it does not violate federal Constitution) can only be repealed by people in subsequent amendment to constitution).

The initiative process is a precious right reserved to the people. The people, however, through their constitution and elected representatives, determine the manner in which this right is to be exercised. In this instance, the people, in an election conducted in May 1998, approved an amendment to their constitution requiring that any "[i]nitiative measures shall contain only one subject."

Prior to this amendment, the state Constitution contained no language specifically addressing the issue of whether an initiative petition seeking to amend the constitution could contain more than one subject. By amending their constitution in May 1998, the people of Nebraska considered that specific question and determined that in such instance, a multiplicity of subjects shall not be permitted. The function of this court is not to question that decision, but to ensure that the initiative process reserved to the people is implemented in the manner the people have chosen. The determination that *Munch v. Tusa,* 140 Neb. 457, 300 N.W.2d 385 (1941), sets forth the appropriate standard does not thwart the will of the people. To the contrary, it upholds it. To permit the proposed measure to be submitted to the people through the initiative process would be to effectively ignore the determination of the people as expressed in their amendment to article III, § 2, and this

court's standard, enunciated 57 years prior to the amendment's passage, for determining when a proposed constitutional amendment contains more than one subject. The district court determined the initiative petition violated the single subject requirement of the constitution in that a "myriad of the provisions of the Initiative Petition for Local Option Gaming have no natural or necessary connection with each other and/or with the general subject of gambling." After my de novo review of the initiative petition, I agree. I therefore concur in the result.

WRIGHT, J., concurring.

There are two reasons why the initiative petition at issue is not "legally sufficient" to place the measure before the voters. The first reason is that the petition does not contain a sworn statement listing the names and addresses of its sponsors. Therefore, I concur in the result reached by the majority. However, I write separately to address the second reason, which is equally important if not more important.

In the case at bar, the issue is whether the initiative petition is legally sufficient. Neb. Rev. Stat. § 32-1412(2) (Reissue 1998) provides in part:

> On a showing that an initiative or referendum petition is not legally sufficient, the court, on the application of any resident, may enjoin the Secretary of State and all other officers from certifying or printing on the official ballot for the next general election the ballot title and number of such measure.

The question presented is whether this court may examine the initiative petition for compliance with Neb. Const. art. III, § 2, to determine the legal sufficiency of the measure preelection or whether the court must wait until the measure has been voted upon and passed by the voters. This question boils down to whether article III, § 2, is a procedural requirement for initiative petitions. I conclude that it is.

Article III, § 2, as amended in 1998 provides in part: "Initiative measures shall contain only one subject." The primary purpose of the single subject rule is to prevent "log-rolling," the practice of combining dissimilar propositions into one proposed amendment "so that voters must vote for or against the whole package even though they would have voted differently had the propositions been submitted separately." See *Tilson v. Mofford*, 153 Ariz. 468,

471, 737 P.2d 1367, 1370 (1987). The rule is designed to ensure that decisions made at the polls represent the free and mature judgment of the electors, so submitted that they cannot be constrained to adopt measures of which in reality they disapprove, in order to secure the enactment of others they earnestly desire. See *Kerby v. Luhrs*, 44 Ariz. 208, 36 P.2d 549 (1934). "[The single subject rule] prevents those who propose initiatives from confusing or deceiving the voters by inserting unrelated provisions in an initiative proposal and 'hiding them' from the voters." *Slayton v. Shumway*, 166 Ariz. 87, 90, 800 P.2d 590, 593 (1990). "It prevents two minority groups from combining different proposals—and thus their votes—to obtain a majority in favor of the joint proposal when neither standing alone could achieve such a majority." *Id.* "[The single subject rule] serves to ensure that each legislative proposal depends upon its own merits for passage and protects against fraud and surprise occasioned by the inadvertent passage of a surreptitious provision 'coiled up in the folds' of a complex bill." *In re Ballot Title 2001-02 No. 43*, 46 P.3d 438, 440 (Colo. 2002) (general discussion of reasons for single subject rule).

Prior to obtaining any signatures on an initiative petition, a statement of the object of the petition and the text of the measure shall be filed with the Secretary of State together with a sworn statement containing the names and street addresses of every person, corporation, or association sponsoring the petition. Neb. Rev. Stat. § 32-1405 (Reissue 1998). Section 32-1405 deals with the form of the petition and the technical requirements for assessing the legal sufficiency of an initiative.

There are both constitutional and statutory prerequisites involved in the initiative process. The Nebraska Constitution requires that an initiative must contain only one subject. Clearly, an initiative that does not comply with the requirements of the constitution cannot and should not be placed before the voters. The Secretary of State's duties in the review of initiative petitions are ministerial in nature. *Duggan v. Beermann*, 249 Neb. 411, 544 N.W.2d 68 (1996). See, also, *State ex rel. Labedz v. Beermann*, 229 Neb. 657, 428 N.W.2d 608 (1988). The Secretary of State is required to perform promptly all the ministerial duties imposed by law. *State ex rel. Brant v. Beermann*, 217 Neb. 632, 350 N.W.2d 18 (1984). In *State ex rel. Brant*, we recognized that the

Secretary of State may refuse to place on the ballot proposed petitions that are facially invalid or unconstitutional.

Prior to the 1998 amendment of article III, § 2, the Secretary of State was authorized to pass upon the facial invalidity of a proposed initiative petition. Now, the constitution requires that initiative petitions must contain only one subject. A petition which contains more than one subject is facially invalid because it does not meet the constitutional requirement. In order for an initiative petition to be legally sufficient, it must not only comply with the technical requirements of § 32-1405, but it must also comply with the constitutional requirements of article III, § 2.

I believe the amendment to article III, § 2, was intended by the Legislature to protect voters in regard to the manner in which initiative petitions seeking to amend the state Constitution may be presented. Constitutional amendments are not to be proposed as package deals which contain multifaceted proposals.

Neb. Const. art. XVI, § 1, requires that legislatively proposed constitutional amendments must be presented to the voters such that they can vote separately on each amendment. The purpose of article XVI, § 1, is to prevent logrolling. Article III, § 2, simply applies this principle to constitutional amendments by initiative petition. An initiative petition proposing to amend the state Constitution cannot contain multisubject proposals which require that the voters adopt all the proposals in order to pass the amendment.

As argued by Loontjer, the Nebraska Constitution has long required that statutory measures proposed by initiatives follow the same "constitutional limitations as to the scope and subject matter" as are applicable to statutes enacted by the Legislature. See Neb. Const. art. III, § 2. This includes the single subject requirement for statutes set forth in Neb. Const. art. III, § 14. Prior to 1998, therefore, legislatively proposed constitutional amendments were subject to a different constitutional provision than were statutory proposals.

The appellants' argument that the standards for statutory proposals must now be applied to constitutional amendments by initiative petition has no historical basis. Article XVI, § 1, of the Nebraska Constitution requires that legislatively proposed constitutional amendments be presented to the voters in a manner

that allows the voters to vote separately on each amendment. I agree with Loontjer's argument that the 1998 amendment was intended to emulate the requirements of article XVI, § 1, and not the single subject standards for statutes. As a result, the 1998 amendment providing that "[i]nitiative measures shall contain only one subject" is intended to prevent logrolling.

The requirements of article III, § 2, are meant to afford protection to the public at the time the petition is signed by requiring that only one subject be presented in the petition. Also, by requiring a single subject when the initiative petition seeks to amend the constitution, the public is not forced to vote for several measures in order to pass a specific measure which is contained within the package.

The district court concluded that the standard for determining whether the petition complied with the single subject rule was that each of its provisions must have a natural and necessary connection with each other and, taken as a whole, with the general subject. The district court relied on *Munch v. Tusa*, 140 Neb. 457, 463, 300 N.W. 385, 389 (1941), in which this court stated:

> "The rule has been laid down that *a constitutional amendment* which embraces several subjects, all of which are germane (near or akin) to the general subject of the amendment, will, under such a requirement, be upheld as valid and may be submitted to the people as a single proposition." . . . In *State [ex rel. Fargo] v. Wetz,* [40 N.D. 299, 168 N.W. 835 (1918)], it was said that the controlling consideration in determining the singleness of an amendment is its singleness of purpose and the relationship of the details to the general subject. . . .
>
> The rule followed by a majority of American jurisdictions is to the effect that where the limits of a proposed law, having natural and necessary connection with each other, and, together, are a part of one general subject, the proposal is a single and not a dual proposition.

(Emphasis supplied.) (Citations omitted.)

In my opinion, the foundation for this requirement is to protect the voter when the voting public is asked to amend its constitution and to clearly define the measure for which the public is voting.

In the case at bar, the public is being asked to amend the constitution to permit the use of video slot machines as a form of gambling in Nebraska. In my opinion, the petition contains subjects that do not have a natural and necessary connection with one another. For example, tuition credits to students have no natural and necessary connection with the legalization of video slot machines. Also, the Legislature's taxing authority is not part of the general subject of gambling. Neb. Const. art. VIII, § 1, provides: "The necessary revenue of the state and its governmental subdivisions shall be raised by taxation in such manner as the Legislature may direct." In effect, the initiative petition before us would amend article VIII, § 1.

In the case at bar, the district court specifically found that the initiative petition did not comply with the single subject requirement. The court determined that "[a] myriad of the provisions of the Initiative Petition For Local Option Gaming have no natural or necessary connection with each other and/or with the general subject of gambling."

As the majority has pointed out, " ' " '[t]he constitutional provision authorizing the legislature to enact laws to facilitate the operation of the initiative power means that it may enact reasonable legislation to prevent fraud or to render intelligible the purpose of the proposed law or constitutional amendment. . . .' " ' " See *State ex rel. Stenberg v. Moore*, 258 Neb. 199, 211, 602 N.W.2d 465, 474 (1999). In *Duggan v. Beermann*, 245 Neb. 907, 915, 515 N.W.2d 788, 794 (1994), we stated: "[I]n adopting the Constitution, the people have imposed upon themselves limitations on their ability to amend this fundamental law." Now, we have a constitutional amendment requiring a single subject for initiative petitions, and the same reasoning would apply to the constitutional requirement in article III, § 2. In order for an initiative petition to be placed before the voters, there is a procedural limitation that the petition contain only one subject. The objective of this requirement would be frustrated if this issue is not adjudicated preelection.

The appellants argue that our decision in *Duggan v. Beermann*, 249 Neb. 411, 544 N.W.2d 68 (1996), prevents this court from deciding the constitutionality of an initiative measure before it has been approved by voters. In my opinion, *Duggan* is readily

distinguishable. In *Duggan*, the district court declined to address the constitutionality of the initiative petition because the measure had not been adopted and an opinion on its constitutionality would be advisory. We held, inter alia, that the district court had correctly declined to enter an advisory opinion or any declaratory judgment unless and until the initiative measure was adopted. We stated that "[t]o the degree that appellants sought a declaration that Measure #408, if adopted, would enact amendments which violated the U.S. or the Nebraska Constitution, appellants were seeking an advisory opinion." *Id.* at 424, 544 N.W.2d at 77.

*Duggan* dealt, in part, with an attempt to litigate the substantive constitutionality of the measure before it was adopted. That is not the issue before us. Here, we are not asked to decide the substantive constitutional defects of the petition, but, rather, whether it complies with the statutory and constitutional prerequisites for placement before the voters. The issue is the legal sufficiency of the initiative petition under § 32-1405 and article III, § 2, of the Nebraska Constitution. The determination of whether the measure contains more than one subject is a justiciable issue that must be decided before the initiative can be submitted to the voters.

The Supreme Court of California in *Senate of the State of Cal. v. Jones*, 21 Cal. 4th 1142, 988 P.2d 1089, 90 Cal. Rptr. 2d 810 (1999), set forth why a determination concerning the single subject provision in California's constitution was ripe for adjudication before the measure was submitted to the voters.

> [D]eferring a decision until after the election not only will defeat the constitutionally contemplated procedure . . . but may contribute to an increasing cynicism on the part of the electorate with respect to the efficacy of the initiative process.
>
> . . . [" ' "[If an initiative measure] is facially defective in its entirety, it is 'wholly unjustified to allow voters to give their time, thought, and deliberation to the question of the desirability of the legislation as to which they are to cast their ballots, and thereafter, if their vote be in the affirmative, confront them with a judicial decree that their action was in vain. . . .' " ' [Citations.]"].

*Id.* at 1154-55, 988 P.2d at 1096-97, 90 Cal. Rptr. 2d at 819.

The Supreme Court of Missouri in *Missourians to Protect Init. Proc. v. Blunt*, 799 S.W.2d 824, 828 (Mo. 1990), held that

[a]ny controversy as to whether the prerequisites of [the one subject requirement] have been met is ripe for judicial determination when the Secretary of State makes a decision to submit, or refuse to submit, an initiative issue to the voters. At that point, a judicial opinion as to whether the constitutional requirements have been met is no longer hypothetical or advisory.

Other courts have also considered the appropriateness of the single subject requirement prior to submission of an initiative to the voters. Like Nebraska, Arizona has refused to consider the substantive constitutionality of initiative petitions prior to adoption by the voters. See *State v. Osborn*, 16 Ariz. 247, 143 P. 117 (1914). However, in *Slayton v. Shumway*, 166 Ariz. 87, 800 P.2d 590 (1990), the court considered an action to enjoin the Secretary of State from certifying and putting an initiative measure on the ballot. The parties alleged that the measure was not legally sufficient because it violated the single subject rule. The court examined the petition and concluded it did not violate the single subject requirement of the state constitution. See, also, *Korte v. Bayless*, 199 Ariz. 173, 16 P.3d 200 (2001) (action seeking to enjoin Secretary of State from placing initiative petition on ballot due to alleged violation of single subject rule).

The Colorado Supreme Court also considered preelection challenges under the state's single subject rule. In *In re Ballot Title 2001-02 No. 43*, 46 P.3d 438, 443 (Colo. 2002), the court discussed the preelection application of Colorado's single subject rule: "Our role is limited. We may not address the merits of a proposed initiative or suggest how an initiative might be applied if enacted; however, we must sufficiently examine an initiative to determine whether or not the constitutional prohibition against initiative proposals containing multiple subjects has been violated."

It makes sense to decide whether an initiative petition complies with the single subject rule before the measure has been submitted to the voters. One of the functions of the judicial branch is to ensure that the people's right to bring an initiative petition is properly exercised. "Expressing the written will of the people, the

Constitution . . . demands that initiative supporters exercise due care and caution appropriate to the significance of that task." *Duggan v. Beermann*, 249 Neb. 411, 435, 544 N.W.2d 68, 82 (1996). A prerequisite to the exercise of the initiative power is set forth in article III, § 2, of the Nebraska Constitution. Had the measure complied with the technical requirements set forth in § 32-1405, the issue of compliance with article III, § 2, would still have to be decided. If the measure were adopted by the voters, they would not have been given the protection required by the constitution that such initiatives contain only one subject.

Thus, I conclude that an initiative petition which on its face contains more than one subject cannot legally be placed upon the ballot for consideration by the voters. The necessity for compliance with this requirement before the measure is voted upon is obvious. If a measure is adopted by the people and then is rejected by the court on the procedural ground that it did not comply with the constitutional requirement of only one subject, the public interest is not well served. The fact that an initiative petition on its face contains more than one subject makes it ripe for judicial determination.

GERRARD, J., joins in this concurrence.